UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FRASNEY DUMKA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 14 C 02711 |
| ELAINE DUKE, Acting Secretary, Department of Homeland Security, | ) ) ) ) | Judge Edmond E. Chang |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

In October 2010, Frasney Dumka was fired from her job at the Federal Emergency Management Agency. Dumka claims that FEMA violated the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*,.[1] by failing to accommodate her disability, by treating her differently based on her disability, and by retaliating against her because she requested accommodations. R. 25, Am. Cmplt. ¶¶ 54-72. FEMA now moves for summary judgment, arguing that the record demonstrates that there are no issues of material fact and that it is entitled to judgment as a matter of law. R. 63, Def. Mot. Summ. J. For the reasons explained below, the government's motion is granted as to Dumka's disparate-treatment and retaliation claims (Counts 2 and 3), but denied for her failure-to-accommodate claim (Count 1).

---

[1] The Court has federal-question jurisdiction over Dumka's claims under 28 U.S.C. § 1331. Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. Under Federal Rule of Civil Procedure 25(d), the Clerk's Office shall substitute the current Acting Secretary of Homeland Security, Elaine Duke, as the defendant in this case.

# I. Background

In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The facts outlined here are undisputed unless otherwise noted.

Frasney Dumka suffers from a disability stemming from a brain injury sustained in a bike accident that happened in the 1970s. R. 66, DSOF[2] ¶ 4. The parties agree that Dumka suffers from attention-deficit/hyperactivity disorder (ADHD), and Dumka also testifies that she suffers from a cognitive learning disability that hinders her ability to understand certain information. R. 68, Pl. Resp. DSOF ¶ 4, R. 68, PSOF Exh. A at 18:5-19:6, Exh. B at 16:18-18:5; DSOF Exh. 3 at ¶ 5. The exact nature of Dumka's disability is unclear, but the government does not contest that she is disabled within the meaning of the Rehabilitation Act. *See generally* R. 65, Def. Mem; *see also* R. 67, Pl. Resp. at 2.

In April 2010, Dumka was hired as a "disaster assistance employee" with FEMA. DSOF ¶ 2. Disaster assistance employees are activated to work for FEMA during disasters, and are paid only for the time that they work. *Id*. at ¶ 3. During her application process with FEMA, Dumka was open about her disability and

---

[2] Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the government's Statement of Facts [R. 66], "PSOF" for Dumka's Statement of Additional Facts [R. 68], "Pl. Resp. DSOF" for Dumka's response to the government's Statement of Facts [R. 68], and "Def. Resp. PSOF" for the government's response to Dumka's Statement of Additional Facts [R. 78].

discussed her need for accommodation with multiple individuals at FEMA.[3] *Id.* ¶ 6; Pl. Resp. DSOF ¶ 6; R. 68, PSOF ¶¶ 1, 4-6, 9-10. Dumka was told that she should inform her site supervisor about her disability and need for accommodation. DSOF ¶ 7.

Dumka's first (and last) FEMA deployment began on August 30, 2010. DSOF ¶ 8. Her supervisor during the deployment was Cassandra Ringsdorf; Ringsdorf's second-in-command was Jean McGhee. DSOF ¶¶ 9-10. On the evening of Dumka's first day of deployment, she informed Ringsdorf about her disability. DSOF ¶ 13. In her deposition, Dumka claims that she told Ringsdorf that she needed to be allowed to ask questions and to be shown "hands on" (rather than simply be told) how to do things the first time. Pl. Resp. DSOF ¶ 13; PSOF ¶ 12; PSOF Exh. A at 42:17-44:10; Exh. B at 121:8-126:11. The government, on the other hand, characterizes Dumka's requested accommodation as merely being allowed to ask questions, DSOF ¶ 13, but the government does not point to any facts contradicting Dumka's testimony that she asked to be *shown* how to do things. *See* R. 73, Def. Resp. PSOF ¶ 12.

Dumka asserts that after telling Ringsdorf about her disability, she felt ignored and shunned by Ringsdorf and McGhee. PSOF ¶ 13. For example, on the second day of the deployment, Dumka rode in a car with Ringsdorf and McGhee and they did not talk to her. DSOF ¶ 15. Dumka also attempted to participate in activities at her worksite, but felt ignored. PSOF Exh. A at 45:7-49:4. Dumka

---

[3] The parties have minor disagreements about which individuals Dumka informed of her disability and when. *See* Pl. Resp. DSOF ¶ 6. But the Court need not address these inconsistencies because the government does not argue that the relevant FEMA officials were unaware of her disability. *See generally* Def. Mem; *see also* Pl. Resp. at 2.

3

believed that the lack of communication was preventing her from learning how to do her job. PSOF ¶ 13. At a lunch with Ringsdorf and McGhee, Dumka tearfully confronted Ringsdorf and asked if she was being ignored because of her disability. Pl. Resp. DSOF at ¶ 15. Ringsdorf responded by scolding Dumka. PSOF ¶ 13.

During the deployment, Dumka struggled with understanding how to fill in her timesheet—an issue that would eventually lead to her termination. The facts here are the subject of some dispute. Dumka's version of the story is that she asked Ringsdorf for help filling out her timesheet, but Ringsdorf refused, telling Dumka to figure it out on her own when she got home. PSOF ¶ 14. Dumka did get help from another FEMA employee, Joe Gibson, who helped her fill in her timesheet for the first day of deployment. Pl. Resp. DSOF ¶ 16. Gibson was too busy to help her fill out the other days, so he introduced Dumka to two other employees, Watson and Robinson. *Id*. Watson offered to help Dumka with her timesheet the following morning before Dumka's flight home to Indiana. *Id*. As Dumka was leaving the office for the day, Ringsdorf overheard her say "See you tomorrow" to Watson and Robinson. *Id*. Hearing this, Ringsdorf told Dumka not to come back the next day. *Id*. Dumka explained that she needed help with her timesheet because of her disability, but Ringsdorf again told Dumka not to come back to the worksite. *Id*.; PSOF Exh. A at 50:13-52:23. The government denies that Ringsdorf told Dumka she could not return for help, but does not cite evidence refuting Dumka's testimony. Def. Resp. PSOF ¶ 14. Despite the friction between Dumka and Ringsdorf over the timesheet,

4

Dumka states that Ringsdorf gave her a positive review at the end of her deployment. DSOF ¶ 17.

Dumka's problems with her timesheet continued after she returned home from her deployment. The main problem[4] was that the timesheet claimed—as compensable work—the time between Dumka's arrival at her hotel on August 30 and her arrival at the FEMA worksite. According to the government, those were hours that are not compensable. DSOF ¶ 26.[5] Upon receiving Dumka's timesheet, McGhee alerted Ringsorf and Dumka's "cadre" manager, Kent Huizinga, that she believed Dumka might have "padded her timesheet." DSOF Exh. 21. This triggered a back-and-forth between Dumka, Huizinga, and other FEMA employees over whether and how Dumka needed to correct her timesheet. DSOF ¶¶ 30.

There is some (mostly irrelevant) dispute about the details of these conversations, but the parties agree that on September 15, Huizinga emailed Dumka and told her that she needed to correct her time entry for August 30 to reflect "actual time worked." DSOF ¶ 31. Dumka responded by email that her timesheet was correct and that she had already reduced her hours by over forty-five minutes that she was entitled to claim "according to policy." DSOF ¶ 32. Huizinga asked Dumka to send him a copy of this policy, and Dumka responded by requesting a phone call so she could confirm that she was doing everything correctly. DSOF ¶ 33-34. Huizinga called Dumka at home on September 16 or 17 and told her that

---

[4] There was also an issue with the lunch time Dumka claimed, but that problem was corrected and does not seem to have been the basis for Dumka's termination. *See* DSOF ¶ 37.

[5] The parties spend some time debating the actual policy, but it does not matter for the purposes of this lawsuit whether or not Dumka was actually entitled to claim this time.

5

she could not claim the time spent at her hotel before reporting to her worksite. DSOF ¶ 35.

The government claims that during the course of Huizinga's interactions with Dumka, he became concerned that she "refused to have her timesheet properly reflect her time worked." DSOF ¶ 35. Dumka, on the other hand, denies that she ever refused to change her time. Pl. Resp. DSOF ¶ 35. Dumka states that she told Huizinga that she could not understand because of her disability, and asked if she could come to Chicago to meet with him so he could show her in person how to complete the timesheet. PSOF ¶ 17; PSOF Exh. A at 78:11-79:11; PSOF Exh. B at 169:3-14, 185:25-186:16. Huizinga refused to meet in person, and instead continued to ask Dumka over the phone whether the time she claimed was "correct." PSOF ¶ 17. Dumka told Huizinga that she did not understand, and that he could correct her timesheet however he wanted: "You know, I don't know what to do. Whatever you do is okay with me. I just wanna do it right." Pl. Resp. DSOF ¶ 35; PSOF Exh. B at 184:21-185:9. Dumka submitted another signed timesheet on September 16 still claiming the disputed hours as time worked. DSOF ¶ 37.

In early October 2010, Dumka received a notice of termination stating that she was being terminated for submission of a false timesheet and for "inappropriate conduct." DSOF ¶ 38. The notice stated that Dumka had made inappropriate comments while on deployment, including referring to a coworker as the "little or short Italian guy," commenting on another employee's Hispanic heritage and skin

6

color, and referring to homosexuals[6] as "queers." DSOF Exh. 22. Dumka emphatically denies making these comments, though she does admit that she referred to another employee as someone who "looks Italian." Pl. Resp. DSOF ¶ 39; Exh. A 88:17-93:5. There is no documentation of the alleged "inappropriate conduct" before the government issued the October notice of termination. PSOF ¶ 18.

## II. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). However, affidavits, depositions, and other written forms of testimony can substitute for live testimony. *Malin v. Hospira, Inc.*, 762 F.3d 552, 554-55 (7th Cir. 2014). The party

---

[6] The federal Office of Personnel Management does not use the term "homosexual," but instead refers to lesbian and gay individuals. *See* https://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/addressing-sexual-orientation-and-gender-identity-discrimination-in-federal-civilian-employment.pdf (accessed November 3, 2017). The notice of termination issued to Dumka, however, did use that term. DSOF Exh. 22.

7

seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Failure to Accommodate

Dumka's first theory of liability is that FEMA refused to provide her with a reasonable accommodation for her cognitive disability in violation of the Rehabilitation Act. In order to prevail at trial, she must show that (1) she is a qualified individual with a disability; (2) her employer was aware of her disability; and (3) her employer failed to reasonably accommodate the disability. *EEOC v. Sears Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005).[7] Because the government is the moving party on summary judgment, it has the burden of demonstrating that no reasonable factfinder could find for Dumka. The government has not met this burden.

Dumka testified in depositions (and will presumably testify at trial) that she has a cognitive disability. *See, e.g.,* PSOF Exh. A at 18:5-24:23. She asked that her supervisors accommodate this disability by allowing her to ask clarifying questions, and, crucially, by *showing* her how to do things. *See, e.g.*, PSOF Exh. A. at 43:21-

---

[7] Claims under the Rehabilitation Act are analyzed under the same standards as claims under the Americans with Disabilities Act. *Peters v. City of Mauston*, 311 F.3d 835, 842 (7th Cir. 2002).

8

44:2 ("I process things differently. I need to be able to ask questions for clarity, and I need—not orally. I need you to show me hands on in technical support."); Exh. B at 20:5-15, 64:20-65:4; 77:24-25. The government does not dispute that Dumka has a cognitive disability, or cite evidence contradicting Dumka's testimony that she asked to be shown how to do tasks. And, significantly, the government has *not* argued (at least for summary judgment purposes) that her requested accommodation of being shown how to perform tasks was unreasonable. So the only remaining issue is whether FEMA failed to provide Dumka with her requested accommodation.

The evidence in the record demonstrates that there is at the very least a dispute of material fact on this point. It is true, as the government points out, that Dumka's supervisors *told* her how to complete her timesheets. *See* Def. Reply at 2-3; DSOF ¶ 20-21, 31-34. But Dumka's uncontroverted testimony is that she requested to be *shown in person* how to accomplish her tasks, and the government does not meaningfully dispute that Dumka was not *shown* how to fill in her timesheet. *See* Def. Reply at 3-4. The government does point out that Joe Gibson, another FEMA employee, helped Dumka fill in her time for her first day of work. *Id*. at 3. But given Dumka's later struggles, there is a question of fact about whether Ringsdorf, Huizinga, or another supervisor should have, in order to provide a reasonable accommodation, shown her how to correctly complete her timesheet. It is worth noting that Huizinga, Dumka's cadre manager, refused to show Dumka how to complete her timesheet even when she offered to visit the office in person for a

demonstration. PSOF ¶ 17. A reasonable jury could find, based on this evidence, that by refusing to *show* Dumka how to complete her timesheets, Dumka's supervisors failed to provide a reasonable accommodation for her disability. Her failure-to-accommodate claim therefore survives summary judgment.

## B. Disparate Treatment

Dumka's next claim is that she was treated less favorably than similar non-disabled employees because of her disability. Specifically, Dumka claims that she was fired because of her disability, and that her supervisor failed to train her because of her disability. These two theories, for the most part, overlap with her failure-to-accommodate claim. Dumka's main argument seems to be that Ringsdorf and Huizinga's failure to adequately train her to complete her timesheets—that is, their failure to provide her requested accommodation—resulted in her firing. Pl. Resp. at 11. This is just the accommodation claim in different packaging.

To the extent that the disparate-treatment claim is independent of the accommodation claim, it does not survive summary judgment. The key question in a disparate-treatment employment discrimination case is whether a reasonable factfinder could conclude, based on the evidence as a whole, that an adverse employment action happened because of the employee's protected characteristic. *See Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). On this record, there

is insufficient evidence for a reasonable factfinder to conclude that either the termination or the failure to train was caused by Dumka's disability.[8]

Dumka testified that Ringsdorf ignored her after learning of her disability, and argues that Ringsdorf's treatment was motivated by discriminatory animus. Pl. Resp. DSOF ¶ 14. As evidence of mistreatment, Dumka states that Ringsdorf talked to McGhee but not to her during a shared car ride. DSOF ¶ 14. Dumka also points out that when she confronted Ringsdorf and asked if Ringsdorf was ignoring her because of her disability, Ringsdorf scolded her. PSOF ¶ 13. Dumka further asserts that Ringsdorf would not show her how to complete her timesheets or allow other employees to help her. PSOF ¶ 14. All this, says Dumka, is sufficient to support an inference of discrimination. Pl. Resp. at 10-11.

But even if this evidence was enough to prove that Ringsdorf disliked Dumka because of her disability, Dumka has not connected Ringsdorf's animus to any adverse employment action. When it comes to Ringsdorf's failure to train Dumka, there is insufficient evidence on the record to establish that Ringsdorf denied Dumka training to which she was entitled or which was given to similarly situated employees. *See, e.g., Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000) (employee was required to demonstrate that he was denied training under circumstances giving rise to an inference of discrimination). And when it comes to Dumka's firing, there is no evidence that Ringsdorf's possible animus played any motivating role. Dumka's unsupported assertion that Ringsdorf "appears to have

---

[8] Except insofar as the firing resulted from a failure to accommodate, which, as discussed, is just Count 1 in different words.

played an integral part" in the firing, Pl. Resp. at 11, does not establish the requisite connection between the discriminatory animus and the adverse employment action.

Nor has Dumka made out a disparate treatment claim under the *McDonnell Douglas* burden-shifting framework. *See Ortiz*, 834 F.3d at 766 (noting that the *McDonnell Douglas* framework remains intact). The *McDonnell Douglas* method of proof allows the plaintiff in a discrimination case to shift, at least provisionally, the burden of proof to the defendant if the plaintiff can make a certain *prima facie* showing. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). To make this *prima facie* showing, the plaintiff must demonstrate, among other things,[9] that similarly situated employees without a disability were treated more favorably.

Although the similarly situated inquiry is flexible, *see Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), it is not expansive enough to encompass Dumka's case. As evidence that similarly situated employees were treated more favorably, Dumka points only to her own testimony about employees who told her that they also experienced difficulties with their timesheets. Pl. Resp. at 12-13. There are two problems with this strategy. First, Dumka has provided no affidavits or depositions from her supposed comparators; all the information about them comes from Dumka's own depositions. This statements of these other

---

[9] To make out a *prima facie* case, the employee must show that (1) that he is disabled under the ADA (or the Rehabilitation Act); (2) that he was meeting his employer's legitimate expectations; (3) that he suffered an adverse employment action; and (4) that similarly situated employees without a disability were treated more favorably. *Bunn*, 753 F.3d at 685.

employees—as reported by Dumka—is hearsay, and thus is neither evidence presented in a form that would be admissible at trial or evidence that could be reduced to admissible form for trial (Dumka does not offer affidavits from these other employees). *See* Fed. R. Civ. P. 56(c)(2); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). But the bigger problem for Dumka is substantive. Her evidence lacks factual detail that would allow a reasonable jury to conclude that these other employees were similarly situated to Dumka. Dumka has offered no evidence that the supposed comparators had comparable positions at FEMA, that they made similar mistakes with their timesheets, or even that they are not disabled. *See, e.g.*, *Snipes v. Illinois Dep't of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002) (the similarly-situated showing "normally entails establishing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." (quotation marks omitted)). Because Dumka cannot meet her burden or shift it to the government, the government is entitled to summary judgment on the disparate-treatment claim.

### C. Retaliation

Last up is Dumka's retaliation claim. As with the disparate treatment claim, Dumka can proceed either by presenting sufficient evidence for a reasonable factfinder to conclude that there was a causal connection between her firing and her

13

statutorily protected activity, or by establishing a *prima facie* case and shifting the burden to the defendant. *Anderson v. Donahoe*, 699 F.3d 989, 994-95 (7th Cir. 2012). Again, Dumka has not succeeded on either method, so government is entitled to summary judgment.

Dumka has not proffered evidence that Ringsdorf, Huizinga, or any other decisionmaker fired her because she engaged in protected activity by requesting an accommodation. The facts on the record are consistent with FEMA's assertion that Dumka was fired because she incorrectly completed her timesheet (though she did not get, for summary judgment purposes, the reasonable accommodation that she asked for). *See* DSOF Exh. 22. Her testimony that Ringsdorf and McGhee were unfriendly to her and that she did not receive in-person help with her timesheet does not undermine this stated reason for the firing.

Nor are the allegedly false allegations of inappropriate comments sufficient to establish retaliation. Yes, it is suspicious that the inappropriate comments were not documented until the notice of termination. But remember, Dumka must prove not only that the stated reasons for the firing were pretextual, but also that the true motivation for the firing was retaliation. Even if her evidence demonstrated the first, it does not establish the second enough for a reasonable jury to find in her favor. Of course, evidence of an employer's dishonesty might be enough in some cases for a factfinder to infer discrimination. *See, e.g.*, *Baines v. Walgreen Co.*, 863 F.3d 656, 665 (7th Cir. 2017). But this case is not one where "the only reason an employer offers for firing an employee is a lie." *See Shagher v. Upjohn Co.*, 913 F.2d

14

398, 401 (7th Cir. 1990). Nor is this a case where the employer's alleged falsehood is one of many pieces of circumstantial evidence of the employer's suspicious behavior. *See Baines*, 863 F.3d at 663. Here, where Dumka's evidence at best shows that her employer was dishonest about one of two legitimate grounds for termination (again, "legitimate" if there had been a reasonable accommodation), and where there is no other reason to think her supervisors acted with discriminatory intent, it would be unreasonable for a factfinder to find that Dumka's firing was retaliatory.

As for the indirect method, Dumka has not identified any similarly situated employees, and so has not made out a *prima facie* case of retaliation. *See Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2005) (employee must show that she was treated less favorably than similarly situated employees who did not engage in the protected activity). Dumka argues that the comparator employees identified for her disparate-treatment claim are also sufficient comparators for her retaliation claim, but this argument is unpersuasive. As discussed above, Dumka has not provided enough evidence to demonstrate that her supposed comparators are similarly situated. What's more, there is little reason to think that employees who were similarly situated for purposes of the timesheet issue are similarly situated for purposes of proving retaliation. Dumka's failure to back up her retaliation claim with evidence entitles the government to summary judgment.

## IV. Conclusion

For the reasons explained above, the Court denies summary judgment on Dumka's failure-to-accommodate claim. Her disparate-treatment claim overlaps

15

with the accommodation claim; but in the interest of avoiding the confusion of overlapping theories and jury instructions, the parties should proceed purely on the failure-to-accommodate theory. Summary judgment is granted for the defendant on the disparate-treatment claim (to the extent it is different than the failure-to-accommodate claim) and on the retaliation claim. The Court orders that the parties start engaging in settlement negotiations, and the status hearing of November 16, 2017, remains as scheduled. It is worth emphasizing that the summary judgment evaluation is very different from trial, where Dumka will have the burden of proof not just on liability but also on the extent of damages. Good-faith efforts at settlement are truly in both sides' best interests.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 6, 2017